R. Stockton RUSH, III, Plaintiff,

v.

OPPENHEIMER & CO., INC. and Scott Seskis, Defendants.

84 Civ. 3219 (RWS).

United States District Court,
S.D. New York.

June 25, 1986.

Christopher Lovell, P.C., New York City, for plaintiff; Christopher Lovell, of counsel.

Gold, Farrell & Marks, New York City, for defendants; Martin R. Gold, Robert P. Mulvey, of counsel.

SWEET, District Judge.

Upon remand, plaintiff R. Stockton Rush III ("Rush") now seeks a jury trial on the issue of fraudulent inducement of the arbitration agreement, a request opposed by defendants Oppenheimer & Co., Inc. ("Oppenheimer") and Scott Seskis ("Seskis") on the ground that there is no material factual basis for asserting such a defense to the arbitration agreement. Upon the memoranda and affidavits submitted and for the following reasons, Rush's request for a jury trial on this issue will be granted.

**Prior Proceedings**

On January 18, 1985, defendants brought a motion to compel arbitration of the state law claims alleged by Rush pursuant to section 4 of the United States Arbitration Act, 9 U.S.C. § 4. By its opinion of March 22, 1985, this court held that the defendants' conduct of litigation had resulted in a waiver of its right to compel arbitration as provided by the arbitration agreement signed by Rush. This determination, however, was reversed by the Court of Appeals.

**Facts as Set Forth Upon the Motion**

On papers submitted it appears that Rush, a nineteen-year old student at Princeton University, obtained control over an inherited block of stock in 1981 and opened an investment account with Seskis at the firm of Drexel Burnham Lambert in May of that year and executed a Client's Security Option Agreement and a Customer's Agreement, both of which contained clauses requiring arbitration of any disputes arising in connection with the account. Rush does not contend that any of these agreements or the arbitration clauses contained therein were fraudulently induced.

Later that year, Seskis joined Oppenheimer and invited Rush to visit Oppenheimer's offices to consider opening an account with them. Construing the facts most favorably to Rush, on November 30, 1985, Rush arrived at Oppenheimer's offices in New York City, met with Seskis and was introduced to other personnel at Oppenheimer. The parties discussed a cover options writing program on 20,000 shares of Natonas common stock held in a trust account for Rush back in California. Rush agreed to such a program and decided to transfer his account at Drexel, consisting of 100 shares of Transcontinental Energy, to Oppenheimer. According to Rush, he refused to transfer money into the account and prohibited any purchases of stock on margin.

A sharp discrepancy in the parties' contentions arises from their accounts of Rush's signing of the Oppenheimer documents on November 30, 1982 which included a margin agreement containing the arbitration clause. Rush states that he was taken into a large office or conference room where he was presented with the documents and told by the defendants that there was no need to read them because they were merely a routine formality to open the account and that he should simply sign them. According to Seskis' deposition testimony, however, Rush was instructed to read the agreements thoroughly and un-

derstand it before signing. Seskis did not recall whether Rush signed the document in his presence at the offices of Oppenheimer or at home. Seskis has testified that he emphasized the nature of the agreement to Rush, but Rush contends that he was opposed to trading on margin and would not have signed the document had he been informed that such was its purpose.

The following week, Seskis called Rush to indicate that not all of the necessary forms were signed at the first meeting. Rush was requested to return to Oppenheimer's offices and on December 9, 1981, he signed a second document which was an option account form that did not contain an arbitration clause. According to Rush, the November 30 document signed by him was entirely unnecessary for the account which he agreed to open with Oppenheimer and that he was fraudulently induced to sign that agreement.

**Discussion**

Section 4 of the Arbitration Act of 1947, 9 U.S.C. § 4, provides that "[i]f the making of the arbitration agreement or the failure, neglect, or refusal to perform the same be in issue, the court shall proceed summarily to the trial thereof." Rush has not raised any issue regarding the scope of the arbitration agreement or its applicability to the present dispute. Instead, the only issue to be determined is whether the arbitration agreement was properly executed by Rush or instead was procured through the fraudulent misrepresentations or omissions of the defendants.

Rush first contends that the defendants were under a duty to disclose the import and effect of the arbitration clause to their prospective client when presenting him with the brokerage agreement. Rush's contention that the defendants' failure to disclose constitutes fraud is based on a release and later ruling of the Securities Exchange Commission (the "Commission"). In 1979, two years before Rush opened his account, the Commission stated that it was:

especially concerned that arbitration clauses continue to be part of form agreements widely used by broker-deal-

ers despite the number of cases in which these clauses have been held to be unenforceable in whole or in part. Requiring the singing of an arbitration agreement without adequate disclosure as to its meaning and effect violates standards of fair dealing with customers and constitutes conduct that is inconsistent with just and equitable principles of trade. In addition, it may raise serious questions of compliance with the antifraud provisions of the securities laws.

Securities Exchange Act Release No. 34–15984 (July 2, 1979), 44 Fed.Reg. 40,462, 40,464 (1979) (footnotes omitted). Given its perception that this release had failed to alter the use of broad, unenforceable arbitration clauses, the Commission initiated proceedings in 1983 which culminated in the adoption of the rule under the antifraud and fraudulent practice provisions of the Securities Exchange Act of 1934:

Reg.Sec. 240.15c2–2. (a) It shall be a fraudulent, manipulative or deceptive act or practice for a broker or dealer to enter into an agreement with any public customer which purports to bind the customer to the arbitration of future disputes between them arising under the federal securities laws, or to have in effect such an agreement, pursuant to which it effects transactions with or for a customer.

17 C.F.R. § 240.15c2–2.

Of course, this rule is not directly controlling, since it is directed against the practice of requiring arbitration of federal securities law claims and not the common law claims which the defendants seek to have arbitrated in this action. Nevertheless, this SEC perspective on the arbitration agreement is relevant since the arbitration clause set forth in the Oppenheimer account forms did purport to bind the customer to arbitration of all claims and thus presented, at the time it was executed, all of the difficulties with which the SEC was concerned. The fact that the defendants did not later attempt to compel arbitration

of the federal claims does not render the SEC ruling irrelevant.[1]

Despite the broad implications which might be drawn from these administrative precedents, agreements to arbitrate common law claims arising from brokerage accounts have consistently been upheld against assertions that they are unconscionable contracts of adhesion. *See, e.g., Pierson v. Dean, Witter, Reynolds, Inc.,* 742 F.2d 334, 339 (7th Cir.1984); *Surman v. Merrill Lynch, Pierce, Fenner & Smith,* 733 F.2d 59, 61 n..2 (8th Cir.1984); *Brener v. A.G. Becker Paribas, Inc.,* 628 F.Supp. 442 (S.D.N.Y.1985); *Finkle & Ross v. A.G. Becker Paribas, Inc.,* 622 F.Supp. 1505 (S.D.N.Y.1985).

Given the strong federal policy in favor of arbitration, *Byrd, supra,* 105 S.Ct. at 1241; *Moses H. Cone Memorial Hospital v. Mercury Construction Corp.,* 460 U.S. 1, 24–26, 103 S.Ct. 927, 941–42, 74 L.Ed.2d 765 (1983), it would be an anomaly to construe such agreements to be contracts of adhesion merely because they involve brokerage accounts. The fact that Rush will be unable to recover punitive damages in arbitration does not itself render such an agreement unconscionable. *See Pierson, supra,* 742 F.2d at 338; *Surman, supra,* 733 F.2d at 63. "Absent a specific showing of unfairness, undue oppression or unconscionability in the case at bar, this court will not refuse to give effect to an arbitration clause." *Finkle & Ross, supra,* 622 F.Supp. at 1512. Therefore, Rush's contention that the defendants were under an absolute duty to disclose and explain the terms of the arbitration clause is unsupported by the case law and will not be adopted here. *See Pelzman v. Paine, Webber, Jackson & Curtis, Inc.,* [1983–84

Transfer Binder] Fed.Sec.L.Rep. (CCH) ¶ 99,408 (D.D.C.1983).

While inclusion of an arbitration clause in the brokerage agreement does not constitute fraud by way of a material omission, Rush also contends that the defendants made material misstatements at the time he executed the brokerage agreement with the arbitration clause. As set forth above, this is a disputed issue. Given the divergence between the parties' accounts of the events of November, 30, an evidentiary hearing is required to determine whether the defendants' statements materially misled Rush into ignoring the import of the arbitration clause.[2]

Finally, Rush also claims that the account agreement containing the arbitration clause was itself fraudulently induced by the defendants. As set forth above, Rush asserts that the account agreement containing the arbitration clause was a margin account agreement which was both unnecessary for the investment program requested by Rush and designed for transactions to which Rush was flatly opposed. Thus, Rush contends that this margin agreement was mistakenly and fraudulently procured by the defendants and the resulting fraud in the making of the agreement renders it voidable, including the arbitration clause.

Whatever the merits of Rush's fraud claim regarding the type of account which he opened, it is not within the jurisdiction of this court on a motion to compel arbitration. As explained by the Court in *Shamir v. Kidder, Peabody & Co.,* [Current] Fed. Sec.L.Rep. (CCH) ¶ 92,511, at 93,097 (S.D. N.Y. Mar. 11, 1986) [Available on WEST-

**1.** Rule 15c2–2 may in time prove to be overbroad. At least one member of the Supreme Court has voiced his willingness to allow arbitration of claims arising under the Securities Exchange Act of 1934. *See Dean Witter Reynolds, Inc. v. Byrd,* 470 U.S. 213, 105 S.Ct. 1238, 1244–45, 84 L.Ed.2d 158 (1985) (White, J., concurring). However, the rule fully comports with the current law in this Circuit holding that a plaintiff cannot be compelled to arbitrate any federal securities claims. *See McMahon v.*

*Shearson/American Express, Inc.,* 788 F.2d 94 (2d Cir.1986).

**2.** The defendants contend that even if Rush's version of the facts is adopted, no misrepresentation occurred since the documents were a mere "formality" necessitated by the fact that Rush's broker, Seskis had changed firms. This interpretation of the facts should not be reached on the basis of the affidavits submitted, since a contrary conclusion is also supportable.

LAW, DCTU database]: "This court has jurisdiction only with respect to claims which raise issues as to the making of the arbitration agreement itself. 9 U.S.C. § 4. The arbitrator is to determine claims of fraud in the inducement of the contract." This dichotomy between claims focusing on the arbitration clause itself and the overall contract was established in this Circuit by *Robert Lawrence Co. v. Devonshire*, 271 F.2d 402 (2d Cir.1959) and has been adopted by higher and lower courts alike. *See Prima Paint Corp. v. Flood & Conklin Mfg. Co.*, 388 U.S. 395, 402, 87 S.Ct. 1801, 1805, 18 L.Ed.2d 1270 (1967); *Todd v. Oppenheimer & Co., Inc.*, 78 F.R.D. 415, 425–26 (S.D.N.Y.1978). Any controversies regarding the execution of the contract generally are for the arbitrators to consider.

Since Rush's claim of fraudulent inducement of the arbitration clause must be decided by trial of that issue, it becomes necessary to determine whether such a trial will be before a jury or the court. Section 4 of the Federal Arbitration Act states that the party opposing arbitration "may ... on or before the return day of the notice of application [for an order to compel arbitration], demand a jury trial of such issue...." The defendants' motion to compel arbitration was returnable on January 4, 1985 and Rush did not demand a jury trial until seven weeks after the return date while the motion was *sub judice*. Under these circumstances, courts have held that the plaintiff has waived his right to a jury trial. *See Hamilton Life Insurance Co. v. Republic National Life Insurance Co.*, 408 F.2d 606, 609 (2d Cir.1969); *Blatt v. Shearson Lehman/American Express, Inc.*, [Current] Fed.Sec.L.Rep. (CCH) ¶ 92,-215 (S.D.N.Y. July 15, 1985) [Available on WESTLAW, DCTU database].

Of course, since the court's initial determination of the motion did not resolve the fraudulent inducement claim and this issue was presented only after the case was remanded, there has been no prejudice to the defendants resulting from the failure to demand a jury trial at the time of application which failure was rectified over a year ago. Section 4 of the Arbitration Act provides the court with the discretion to "specially call a jury" even where the party has failed to make a proper demand, and it seems appropriate to exercise that discretion under the circumstances presented here. Therefore, a bifurcated trial of the merits and the arbitration issue will be held with the arbitration issue to be decided initially.

For the reasons set forth above, the defendants' motion to compel arbitration of the common law claims will be denied pending a trial on the issue of whether the arbitration clause was fraudulently induced. Discovery is to be completed by July 16, 1986 and the pretrial order submitted by July 23, 1986.

IT IS SO ORDERED.