IT IS HEREBY ORDERED that the Court's order of March 5, 1987 is AMENDED.

IT IS FURTHER ORDERED that judgment is entered in favor of plaintiff United States and against defendant Richard D. Bushman on the merits in the amount of $17,900.80 with interest at the rate of 6.09 percent from March 5, 1987 until paid.

IT IS FINALLY ORDERED that judgment is entered in favor of plaintiff United States and against defendant Robert L. Bushman on the merits in the amount of $14,638.72 with interest at the rate of 6.09 percent from March 5, 1987 until paid.

James R. DOUGHERTY, Betty Dougherty, Mary Kay Hall, Stephen E. Sullivan, Stuart Snyder, Constance M. Wulfaert, Mary Tierney Gallagher, Mary Gallagher and Peter Gallagher, Plaintiffs,

v.

Robert John MIECZKOWSKI, Richard Camp, Frank Kane, and Prudential-Bache Securities, Inc., Defendants.

Civ. A. No. 86-108 MMS.

United States District Court, D. Delaware.

May 11, 1987.

Roderick R. McKelvie, and Randall E. Robbins, of Ashby, McKelvie & Geddes, Wilmington, Del., for plaintiffs.

Robert J. Mieczkowski, pro se.

Stephen E. Herrmann, and Nathan B. Ploener, of Richards, Layton & Finger, Wilmington, Del., for defendants Prudential-Bache Securities, Inc., Richard Camp and Frank Kane.

## OPINION

MURRAY M. SCHWARTZ, Chief Judge.

Plaintiffs sued Robert Mieczkowski ("Mieczkowski"), their former broker, Richard Camp ("Camp") and Frank Kane ("Kane"), the managers of the Wilmington, Delaware, office of Prudential-Bache Securities, Inc. ("Prudential-Bache") and Prudential-Bache for violations of § 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j, Rule 10b–5 promulgated thereunder, § 20(a) of the Act, 15 U.S.C. § 78t, and for state common law fraud, misappropriation, and negligence. Prudential-Bache employed Mieczkowski as a broker from early 1982 until August 1985, where he managed the plaintiffs' accounts, all of which were non-discretionary. Camp was Office Manager of the Wilmington branch from March, 1982, to October, 1984, succeeded by Kane, who remained manager through the rest of Mieczkowski's tenure.

Defendants have filed motions to compel arbitration of plaintiffs' federal and state law claims under the Federal Arbitration Act ("FAA"), 9 U.S.C. §§ 1–14, and to sever plaintiffs' claims for separate trial under Federal Rule of Civil Procedure 20. The distinct factual circumstances of each plain-

tiffs' dealings with Mieczkowski and Prudential-Bache will be examined before turning to the motions at issue.

## I. Background [1]

There are six sets of plaintiffs pursuing either individual or joint claims against the defendants. Each separate course of dealing will be described.

### A. James and Betty Dougherty ("the Doughertys")

The Doughertys were long-time friends with Mieczkowski, who initially solicited their patronage while playing golf with Mr. Dougherty in 1979. Upon moving to Prudential-Bache from another firm, Mieczkowski opened an account for the Doughertys in June, 1982. Over the next three years, the Doughertys invested $88,000 through Prudential-Bache, and claim that by late 1985 their account principal had dropped to approximately $26,000. They state Mieczkowski consistently misled them as to the value of their account and failed to explain the monthly account statements. In July, 1985, Mr. Dougherty complained to Kane, the Prudential-Bache branch manager, about Mieczkowski's conflicting explanations of the value of the account. The Doughertys assert their losses are attributable to excessive trading by Mieczkowski disproportionate to the size and nature of the account. One example of this activity was an alleged unauthorized purchase of GNMA ("Ginnie Mae") bonds on margin. The Doughertys also allege Mieczkowski made an unauthorized $5,000 withdrawal from their account in August, 1983.

A "Customers Agreement," containing a clause requiring arbitration of all claims arising out of the account, contains the purported signatures of the Doughertys and is dated "3/10/83." The Doughertys assert the signatures are forgeries, and R. David Wilkinson, Chief Document Examiner for the Delaware State Police, has submitted an affidavit expressing his opinion

that the signatures are not genuine. Docket ("Dkt.") 87, Wilkinson Affidavit. The Doughertys subsequently signed a standard Prudential-Bache "Joint Account Agreement" in April, 1984, with an identical arbitration clause. In August, 1985, after Mieczkowski moved to a different brokerage firm, he requested the Doughertys to switch their account.

The Doughertys claim Mieczkowski bought and sold securities on margin in an excessive amount, thereby diminishing the value of their account, and that Prudential-Bache, Camp and Kane are liable for those unauthorized trades as controlling persons under § 20(a). Plaintiffs assert Prudential-Bache and Kane knew of Mieczkowski's fraudulent acts, and had a duty to warn them when Mieczkowski solicited the account transfer ("failure to warn claim"). The Doughertys have also alleged common law fraud and negligence against Prudential-Bache and Kane, and a misappropriation claim against Camp, Kane, and Prudential-Bache ("state law claims").

### B. Mary Kay Hall ("Hall")

Hall, the Doughertys' daughter, opened an account at Prudential-Bache through Mieczkowski in 1983, investing $25,000. She claims Mieczkowski entered into a pattern of unauthorized and excessive purchases and sales for her account, including unauthorized Ginnie Mae bond transactions on margin totaling $400,000. She also states Mieczkowski delayed sending her a $3,000 check she requested and failed to explain the monthly account statements, and misled her regarding the value of her account. A Customers Agreement with Hall's purported signature is alleged to be a forgery, and Mr. Wilkinson opines that the signature is not genuine. Dkt. 87. Upon moving to the new firm, Mieczkowski solicited Hall to change her account. Plaintiff Hall also asserts § 20(a) liability, failure to warn, and state law claims.

---

**1.** The Court will treat the plaintiff's allegations as true for the purposes of these motions. The standard for considering the parties' evidence in a motion to compel arbitration is similar to that of a summary judgment motion: the allegations will be considered in the light most favorable to the party opposing the motion. *See Par-Knit Mills v. Stockbridge Fabrics,* 636 F.2d 51, 54 (3d Cir.1980).

### C. Stephen Sullivan ("Sullivan")

Sullivan invested over $60,000, funds he had received in a personal injury settlement, with Prudential-Bache in March, 1984. He states he instructed Mieczkowski to invest the money in long-term growth securities. It is not clear from the record what securities Sullivan authorized Mieczkowski to trade. The account declined in value, however, and when queried about this, Mieczkowski informed Sullivan that the monthly account statements did not reflect the true worth of the investment. On April 9, 1985, Mieczkowski wrote a letter detailing the account and putting the total value at $77,639.93. A new Prudential-Bache broker told Sullivan in September, 1985, that the monthly account statements were accurate, as opposed to the April 9 letter. Sullivan claims Mieczkowski bought and sold securities in a manner inconsistent with his investment objectives and in an amount disproportionate to the account. He also asserts § 20(a) liability and state law violations.

### D. Stuart Snyder ("Snyder")

Snyder, a college friend of Mieczkowski, invested $14,000 in a Prudential-Bache account in January, 1983. Snyder claims Mieczkowski made unauthorized investments in Ginnie Mae bonds on margin in an excessive amount in relation to the size of the account. When questioned by Snyder, Mieczkowski denied having made the investments, stating the monthly account statements were incorrect, and later told Snyder the account had greater value than the statements reflected. After taking the account with him to another brokerage firm, Mieczkowski delayed closing Snyder's account because its value was less than Mieczkowski had stated. Snyder also asserts § 20(a) liability, failure to warn, and state law claims.

### E. Constance Wulffaert ("Wulffaert")

Wulffaert invested over $160,000, her life savings, in a Prudential-Bache account in March, 1985. She instructed Mieczkowski to invest in safe, income producing securities that would cover her living expenses. She claims Mieczkowski told her the value of her investment was greater than the amount stated in the monthly account statements, and that Mieczkowski entered into a series of unauthorized and excessive trades causing the account to diminish in value. After Mieczkowski transferred to a new firm, Wulffaert states he made an unauthorized purchase of an interest in a tax sheltered real estate limited partnership for $40,000, and sold her share in a mutual fund, again without authorization. Wulffaert also asserts § 20(a) liability, failure to warn, and state law claims, except the latter claims do not encompass Camp because he was not branch manager during the period plaintiff maintained her account with Prudential-Bache.

### F. Mary Tierney Gallagher ("Mrs. Gallagher"), Mary Gallagher ("Ms. Gallagher"), and Peter Gallagher ("The Gallaghers")

Mrs. Gallagher, an 81 year-old widow, invested over $191,000 in a joint account with her two children, Mary and Peter, at Prudential-Bache in the fall, 1983. She authorized Mieczkowski to invest the funds in three specific securities. Mieczkowski subsequently made unauthorized margin purchases of Ginnie Mae bonds and other unauthorized and excessive trades diminishing the value of the account. After receiving a margin call from Prudential-Bache, the Gallaghers met with Mieczkowski on March 18, 1985. Mieczkowski wrote and signed a statement that "This is to guaranty that this is not a margin account," and on April 4, 1985, delivered a letter stating that the account's value was $239,414.50. Ms. Gallagher thereafter complained about Mieczkowski to Kane and their attorney began negotiations to recover Mrs. Gallagher's losses. In July, 1985, Prudential-Bache represented that Mrs. Gallagher had deposited a total of $181,000 in the account, and the parties agreed the company would restore that amount to the account. The Gallaghers also signed a general release settling their claim. The Gallaghers were subsequently informed by an accountant that Mrs. Gallagher had deposited a total of $191,453 in the account. The Gallaghers

contest the validity of the release, and assert § 20(a) liability and state law claims.

## II. Motion to Compel Arbitration

Defendant alleges that among the plaintiffs, the Doughertys, Hall and Snyder have signed Customer Agreements mandating arbitration of all their claims.[2] Defendants argue the FAA compels this Court to stay these plaintiffs' claims pending arbitration of the disputes.[3] Snyder agrees the Agreement applies to his state common law claims, but disputes the arbitrability of his federal law claims under 10b–5. The Dougherty and Hall argue their signatures were forged on the Customer's Agreement and therefore the arbitration clause does not govern their claims. The Doughertys concede they signed a Joint Account Agreement containing an arbitration clause, but argue Mieczkowski fraudulently induced them to sign it.

The Court will begin by reviewing the provisions of the FAA and its underlying policy, and then determine whether the Agreements at issue are subject to an order compelling arbitration, and, if so, what claims are arbitrable.

### A. The Federal Arbitration Act

9 U.S.C. § 2 provides:

A written provision in any maritime transaction or a contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction, or the refusal to perform the whole or any part thereof, or an agreement in writing to submit to arbitration an existing controversy arising out of such a contract, transaction, or refusal, shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract.

In the present context, the defendants seek a stay of proceedings pending arbitration under 9 U.S.C. § 3, which provides:

If any suit or proceeding be brought in any of the courts of the United States upon any issue referable to arbitration under an agreement in writing for such arbitration, the court in which such suit is pending, upon being satisfied that the issue involved in such suit or proceeding is referable to arbitration under such an agreement, shall on application of one of the parties stay the trial of the action until such arbitration has been had in accordance with the terms of the agreement, providing the applicant for the stay is not in default in proceeding with such arbitration.

The Supreme Court has interpreted the provisions of the FAA broadly, holding that "... as a matter of federal law, any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration, whether the problem at hand is the construction of the contract language itself or an allegation of waiver, delay, or a like defense to arbitrability." *Moses H. Cone Hospital v. Mercury Constr. Corp.*, 460 U.S. 1, 24–25, 103 S.Ct. 927, 941, 74 L.Ed.2d 765 (1983) (footnote omitted). In construing the language in § 2, that an arbitration term is enforceable "save upon such grounds as exist at law or in equity for the revocation of any contract," the Supreme Court stated "... a federal court may consider only issues relating to the making and performance of the agreement to arbitrate." *Prima Paint Corp. v. Flood &*

**2.** Prudential-Bache has a standard "Customer's Agreement" form, which provides for arbitration of all disputes arising under the Agreement. The Agreement states:

Any controversy arising out of or relating to my account, to transactions with or for me or to this Agreement or the breach thereof, and whether executed or to be executed within or outside of the United States, except for any controversy arising out of or relating to transactions in commodities or contracts related thereto executed on or subject to the rules of a

contract market designated as such under the Commodity Exchange Act, as amended, shall be settled by arbitration in accordance with the rules then obtaining of either the American Arbitration Association or the Board of Governors of the New York Stock Exchange as I may elect.

**3.** Defendants concede that Sullivan, Wulffaert, and the Gallaghers did not sign a Customer's Agreement, and their claims are not subject to arbitration.

*Conklin Mfg. Co.,* 388 U.S. 395, 404, 87 S.Ct. 1801, 1806, 18 L.Ed.2d 1270 (1967).

A challenge to an agreement to arbitrate will center on the issue of fraudulent conduct in the formation of the contract. The type of fraud, whether it is fraud in the inducement or fraud in the factum, and whether that conduct goes to the entire contract or only the arbitration clause, determines whether the Court will order arbitration of the claim. Under the FAA, the arbitration clause is severable from the contract, and all disputes arising under the contract are subject to arbitration except those that make "an independent challenge to the making of the arbitration clause itself." *Unionmutual Stock Life Ins. Co. v. Beneficial Life Ins. Co.,* 774 F.2d 524, 529 (1st Cir.1985). In *Prima Paint,* the Supreme Court considered the plaintiff's fraudulent inducement defense to the contract, based on defendant's misrepresentation of solvency, as a basis for avoiding arbitration of a dispute. The Court held that, even if the contract was voidable based on that defense, the FAA "... does not permit the federal court to consider claims of fraud in the inducement of the contract generally." 388 U.S. at 404, 87 S.Ct. at 1806. To compel arbitration, therefore, the defendants need only establish the following: 1) the existence of an agreement to arbitrate; 2) arbitrable claims; 3) no waiver of the right to arbitration. *McMahon v. Shearson/American Express, Inc.,* 618 F.Supp. 384, 386 (S.D.N.Y.1985), *rev'd on other grounds,* 788 F.2d 94 (2d Cir.), *cert. granted,* —— U.S. ——, 107 S.Ct. 60, 93 L.Ed.2d 20 (1986); *New Process Steel Corp. v. Titan Industrial Corp.,* 555 F.Supp. 1018, 1021 (S.D.Tex. 1983).

Defendants argue the Customer's Agreement signed by the Doughertys and Hall met the threefold requirements for an order to compel arbitration under the FAA: The state and federal law claims are clearly arbitrable issues, there is no alleged waiver of the arbitration right, and plaintiffs do not allege fraud in the inducement in agreeing to arbitrate disputes. According to defendants, there is no permissible basis under *Prima Paint* and *Moses H. Cone Hospital* to avoid arbitration of plaintiffs' claims. Moreover, defendants argue the Joint Account Agreement executed by the Doughertys also requires arbitration of their claims, even if the Customer's Agreement is not enforceable. The Doughertys and Hall argue their signatures on the Customer's Agreements are forged, and the Agreements are not binding contracts. The status of these Agreements, and the Doughertys' Joint Account Agreement, must be ascertained in order to determine if the defendants have a contractual right to insist upon arbitration.

**B. Customer's Agreements**

In *Prima Paint,* the Supreme Court stated a court could decline to order arbitration if plaintiffs specifically claim "fraud in the inducement of the arbitration clause itself—an issue which goes to the 'making' of the agreement to arbitrate...." 388 U.S. at 403–404, 87 S.Ct. at 1806. Some courts have construed this statement to mean that a party's *sole* method to attack an arbitration clause is through a specific challenge to the agreement to arbitrate. *See Unionmutual Stock Life Ins. Co. v. Beneficial Life Ins. Co.,* 744 F.2d at 529 ("The teaching of *Prima Paint* is that a federal court must not remove from the arbitrators consideration of a substantive challenge to a contract *unless* there has been an independent challenge to the making of the arbitration clause itself.") (Emphasis added); *Brener v. Becker Paribas Inc.,* 628 F.Supp. 442, 446 (S.D.N.Y.1985) ("The court will become involved *only* if there is a specific allegation that the arbitration clause itself, standing apart from the overall argument, was induced by fraud.") (Emphasis added); Hirshman, *The Second Arbitration Trilogy: The Federalization of Arbitration Law,* 71 Va.L.Rev. 1305, 1335 ("A litigant who wishes to resist arbitration is thus left with the sole option of attacking the arbitration clause itself."). Although a finding of fraud in the inducement to enter a contract may ultimately permit an innocent party to avoid performance of the agreement, the question of whether fraud occurred is an issue to be

decided by the arbitrator, if the contract so mandates. *See Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Haydu,* 637 F.2d 391, 398 & n. 11 (5th Cir.1981) (claim of coercion, undue influence and duress in signing contract subject to arbitration); *Rush v. Oppenheimer & Co., Inc.,* 638 F.Supp. 872, 875 (S.D.N.Y.1986) (claim of fraud in the inducement to enter a margin account agreement subject for arbitrator).

■ The premise on which a court can order arbitration, however, is the existence of an agreement; if no contract exists, there is no right to arbitration. *See Par-Knit Mills v. Stockbridge Fabrics,* 636 F.2d 51, 54 (3d Cir.1980) (express unequivocal agreement to arbitrate must exist before court can order arbitration); *Woodyard v. Merrill Lynch, Pierce, Fenner & Smith,* 640 F.Supp. 760, 764 (S.D.Tex.1986) ("Assuming that the Plaintiff's claims are legally arbitrable, the question then is whether the parties ever had an agreement to arbitrate."). Under the common law of contracts, there is a distinction between fraud in the inducement and fraud in the "factum," or execution. Fraud in the factum occurs when a party makes a misrepresentation that "is regarded as going to the very character of the proposed contract itself, as when one party induces the other to sign a document by falsely stating that it has no legal effect." E. Farnsworth, *Contracts* § 4.10 at 235. If the misrepresentation is of this type, then "there is no contract at all, or what is sometime anomalously described as a void, as opposed to voidable, contract." *Id.; see Restatement (Second) Contracts* § 163, comment a (if misrepresentation of character or essential term of contract, "no effective manifestation of assent and no contract at all"). If the fraud relates to the inducement to enter the contract, then the agreement is "voidable" at the option of the innocent

party. *Restatement (Second) Contracts* § 164. The distinction is that if there is fraud in the inducement, the contract is enforceable against at least one party, while fraud in the factum means that at no time was there a contractual obligation between the parties.

■ The Court of Appeals for the Eleventh Circuit explicitly recognized that a defense of fraud in the factum requires that the court decide whether a contract exists, not an arbitrator. *Cancanon v. Smith, Barney, Harris, Upham & Co.,* 805 F.2d 998, 999–1000 (11th Cir.1986). Based on the plaintiffs' allegations that defendant's employee misrepresented the nature of an account agreement printed in English when plaintiffs were unable to read English, the Circuit Court held the evidence "sufficiently raises the issue of fraud in the factum. This issue is not subject to resolution by arbitration, and the plaintiffs are entitled to a trial on this issue." *Id.* at 1001. Where the very existence of the agreement is placed in contention, as opposed to the circumstances surrounding a party's assent, then that dispute is not arbitrable under the FAA. *See Par-Knit Mills v. Stockbridge Fabrics,* 636 F.2d 51, 55 (3d Cir.1980) (unequivocal denial agreement was made should be sufficient to require court or jury to decide existence of contract);[4] *T & R Enterprises v. Continental Grain Co.,* 613 F.2d 1272, 1277–78 (5th Cir.1980); *Woodyard v. Merrill Lynch, Pierce, Fenner & Smith,* 640 F.Supp. at 766.

Defendants concede the Doughertys and Hall did not sign the Customer Agreements. Defendants argue, however, that these plaintiffs ratified the Agreement, including the arbitration clause, because they continued to receive benefits under the contract and entered into brokerage transac-

---

**4.** The issue in *Par-Knit Mills* was whether a production manager had sufficient authority to bind the plaintiff to a contract containing an arbitration clause. The Circuit Court held that plaintiff's affidavit created an issue as to the existence of the contract, thereby requiring a judicial determination before arbitration could be ordered. The Court noted that "... its determination in this matter may run contrary to the

general policy of encouraging the arbitration of disputes." 636 F.2d at 55. In light of the Supreme Court's strong reaffirmation of the policy favoring arbitration in *Moses H. Cone Hospital,* it is doubtful whether the specific holding in *Par-Knit Mills* remains efficacious. However, the general teaching of *Par-Knit Mills* concerning issues relating to the existence of the contract continues in force and binds this Court.

tions through Prudential-Bache. The gist of the argument seems to be that, although plaintiffs did not sign the Agreements or overtly manifest assent, they were sophisticated market investors. As such, they knew or should have known that a brokerage contract, including an arbitration clause, would govern their relationship with Prudential-Bache.

■ The defendants correctly point out that a person may be bound by an agreement to arbitrate even though the contract has not been signed. *McAllister Brothers Inc. v. A & S Transportation Co.*, 621 F.2d 519, 524 (2d Cir.1980); *Blatt v. Shearson/American Express*, [Current] Fed.Sec. L.Rep. ¶ 92,976, at 94,798 (S.D.N.Y.1986) [Available on WESTLAW–DCT database]. In determining whether a party has subsequently ratified a contract, the Court must apply the standard principles of the law of contracts. Under the *Restatement (Second) Contracts* § 163, if a person "neither knows nor has reasonable opportunity to know of the character or essential terms of the proposed contract, his conduct is not effective as a manifestation of assent." In such a case, the contract is considered "void," the consequence of which is that a person "may be held to have ratified the contract [by conduct] if it is voidable but not if it is 'void.'" § 163 comment c.

■ Defendants have not placed in the record any evidence that demonstrates the Doughertys or Hall knew or had reason to know that documents with allegedly forged signatures were in Prudential-Bache's files. Defendants cannot rely on a contract which plaintiffs never signed and, on the record, never saw, to establish the existence of an agreement to arbitrate. Moreover, defendants cite no authority for the proposition that a person should know, by reason of having requested a broker to execute securities transactions, they will be bound by the broker's form contract mandating arbitration of all disputes. Basic contract principles require some objective evidence of assent, especially in the present context where an agreement to arbitrate forces a party to forego substantial rights. The act of placing orders through Prudential-Bache, standing alone, is insufficient to demonstrate the requisite manifestation of assent to a contract. Plaintiffs' sophistication in the market may affect the substantive analysis of their 10b–5 claims, *see infra*, but it does not have any direct bearing on the contract question.

In light of the defendants' concession that the Doughertys and Hall did not sign the Customer's Agreements, and plaintiffs' uncontroverted affidavit that the signatures are forgeries, the Court finds under 9 U.S.C. § 4 that "the making of the arbitration agreement ... [is] in issue." Therefore, the Court will hold in abeyance defendant's motion to compel arbitration of disputes related to transactions governed by the Customer's Agreements, and order the question of the arbitration agreements' existence be tried under the provisions of 9 U.S.C. § 4.[5]

## C. Joint Account Agreement ("JAA")

■ In April, 1984, Mieczkowski requested that the Doughertys open a new account at Prudential-Bache and sign the necessary papers. Although the parties disagree as to the type of account opened, the Doughertys do not dispute having signed the JAA or that the contract is facially valid. The JAA contains an arbitration clause, similar to the Customer's Agreement, that "[a]ny controversy arising out of or relating to my account, to transactions with or for me or to this agreement or breach thereof, shall be settled by arbitration...."

The Doughertys argue they were fraudulently induced to sign the JAA by Miec-

**5.** It is highly doubtful, given the present record, that the defendants can prove the existence of an agreement to arbitrate under the forged Customer's Agreements by the Doughertys and Hall. The procedural posture of the case, however, requires the Court to order this question be set for trial. Under 9 U.S.C. § 4, if, as the Court holds, the making of the arbitration agreement is in issue, then the FAA directs that "the court shall proceed summarily to the trial thereof." Only after the resolution of the arbitration issue can the Court grant or dismiss the motion to compel. Therefore, the Court cannot decide the merits of the motion until trial or on a motion for summary judgment if there is no material issue of fact.

zkowski, who was seeking their authorization to open the new account to cover up his earlier misdealings. Plaintiffs assert Mieczkowski perpetrated a second fraud by having them agree to a contract with an arbitration clause which would force them to give up their right to bring a federal action under 10b–5 for the initial fraudulent acts. In effect, they argue Mieczkowski's failure to disclose the effect of signing the JAA, including the arbitration provision, constituted fraud.

In seeking to avoid the holding in *Prima Paint*, that claims of fraud in the inducement to enter the contract are subject to an arbitration clause, the Doughertys argue that Mieczkowski's fraudulent inducement was directed specifically at securing the arbitration clause. They assert that a second wrong should not insulate defendants from trial in federal court, as opposed to arbitration, on the first wrong.

The plaintiffs argument is superficially appealing, but succumbs to two flaws. First, assuming Mieczkowski fraudulently induced the signing of the JAA, the second fraud does not vitiate the first, but only sends the dispute to arbitration. The Doughertys have not been deprived of either a remedy or compensation, if it is due. *See Rush v. Oppenheimer & Co., Inc.*, 638 F.Supp. 872, 875 (S.D.N.Y.1986). Second, plaintiffs have not brought forth any evidence to show Mieczkowski's fraud went directly to the arbitration clause. In fact, their position is essentially one of fraud in the inducement of the entire JAA if, as

they assert, Mieczkowski intended the JAA to cover up his earlier misdeeds. The entire contract, and not merely the arbitration provision, would necessarily serve the purpose of protecting Mieczkowski's previous unauthorized actions from a federal court action. *Prima Paint's* holding is inescapable that the FAA "... does not permit the federal court to consider claims of fraud in the inducement of the contract generally." 388 U.S. at 404, 87 S.Ct. at 1806.

The arbitration clause at issue is extremely broad. The Doughertys argue, however, that claims arising prior to their signing the JAA in April, 1984, cannot be governed by the contract. The question of whether those claims are subject to the arbitration clause relates directly to the meaning and construction of the agreement's language. *See Shotto v. Laub*, 632 F.Supp. 516, 522 (D.Md.1986) (whether plaintiffs signed agreement before or after claims arose does not affect arbitrability). As such, the arbitrator, not the Court, will resolve all issues of arbitrability arising out of the contract. This result comports with *Moses H. Cone Hospital*, where the Supreme Court stated that "any doubts concerning the scope of arbitrable issues should be resolved in favor or arbitration...." 460 U.S. at 24–25, 103 S.Ct. at 941, *see Unionmutual Stock Life Ins. v. Beneficial Life Ins. Co.*, 774 F.2d at 528.[6] The Doughertys' claims, therefore, are subject to the JAA's arbitration provision, and the Court will grant defendants' motion to compel arbitration under that agreement.[7]

6. The Doughertys also assert that the question of the scope of arbitrable issues must first be determined by the Court, not the arbitrator. In support of their argument, they cite the recent decision in *AT & T Technologies v. Communications Workers of America*, —— U.S. ——, 106 S.Ct. 1415, 89 L.Ed.2d 648 (1986), where the Supreme Court held, "It was for the court, not the arbitrator, to decide in the first instance whether the dispute was to be resolved through arbitration." *Id.* at 1420. *AT & T Technologies*, however, deals with arbitration questions in the collective bargaining context governed by § 301(a) of the Labor-Management Relations Act, 29 U.S.C. § 185(a). The decision is inapposite because the FAA controls the present case, compelling a different result regarding the arbitrator's power to determine the scope of arbitrability.

7. There are two agreements with arbitration clauses at issue. The procedural posture of the Doughertys case yields an anomalous result because one motion to compel arbitration will be held in abeyance while the other will be granted. The question of whether an agreement to arbitrate under the Customer's Agreement exists must be tried under 9 U.S.C. § 4. *See supra* note 5. The JAA requires arbitration of the Doughertys' claims, and under *Moses H. Cone Hospital* the arbitrator will decide what claims, if any, are governed by that agreement. It is possible the arbitrator will determine the JAA covers disputes prior to the signing of that agreement, thereby deciding claims that may also be governed by the Customer's Agreements. In effect, the Doughertys case is on two different tracks that may ultimately make resolution

## D. Arbitrability of Federal Law Claims

Defendants' motion to compel included a request that the Court order arbitration of the Doughertys', Hall's [8] and Snyder's federal law claims arising under Rule 10b–5. This question has generated disagreement among the district courts, and a split in the circuits. *See Note, The Enforceability of Predispute Arbitration Agreements Under 10(b) and 10b–5 Claims*, 43 Wash. & Lee L.Rev. 923, 946 & n. 178; *Note, Arbitrability of Claims Arising Under the Securities Exchange Act of 1934*, 1986 Duke L.J. 548, 562–64 & n. 94–98 (listing cases). The Third Circuit Court of Appeals recently reaffirmed its holding in *Ayers v. Merrill Lynch, Pierce, Fenner & Smith*, 538 F.2d 532 (3d Cir.), *cert. denied*, 429 U.S. 1010, 97 S.Ct. 542, 50 L.Ed.2d 619 (1976), that 10b–5 claims are not arbitrable. *Jacobson v. Merrill Lynch, Pierce, Fenner & Smith*, 797 F.2d 1197 (3d Cir.1986). The Second, Sixth, Ninth and Eleventh Circuit Courts of Appeals have followed a similar course. *Sterne v. Dean Witter Reynolds, Inc.*, 808 F.2d 480 (6th Cir.1987); *Wolfe v. E.F. Hutton & Co., Inc.*, 800 F.2d 1032 (11th Cir. 1986) (en banc); *Conover v. Dean Witter Reynolds, Inc.*, 794 F.2d 520 (9th Cir.1986); *McMahon v. Shearson/American Express, Inc.*, 788 F.2d 94 (2d Cir.), *cert. granted*, ── U.S. ──, 107 S.Ct. 60, 93 L.Ed.2d 20 (1986). The First and Eighth Circuit Courts of Appeals has held that 10b–5 claims are subject to arbitration agreements, *see Page v. Moseley, Hallgarten, Estabrook & Weeden, Inc.*, 806 F.2d 291 (1st Cir.1986); *Phillips v. Merrill Lynch, Pierce, Fenner & Smith*, 795 F.2d 1393 (8th Cir.1986), as have a number of district courts. *See, e.g., Fisher v. Prudential-Bache Securities, Inc.*, 635 F.Supp. 234 (D.Md.1986); *Schriner v. Bear, Stearns & Co., Inc.*, 635 F.Supp. 373 (N.D.Cal.1986); *Prawer v. Dean Witter Reynolds, Inc.*, 626 F.Supp. 642 (D.Mass.1985); *cf.* Note, 43 Wash. & Lee L.Rev. at 944 n. 168.

The Supreme Court granted certiorari to consider the arbitrability question in *McMahon v. Shearson/American Express, Inc.*, a decision from the Second Circuit Court of Appeals denying a motion to compel arbitration of 10b–5 claims. 788 F.2d 94 (2d Cir.1986). Oral argument in *McMahon* was heard on March 3, 1987. Although the law of this Circuit and the trend among the Courts of Appeals disapproves arbitration of 10b–5 claims, in light of the pending Supreme Court consideration of this issue any action on this aspect of defendants' motion would be premature. The Court will hold the motion in abeyance until the Supreme Court issues its decision in *McMahon*.

## III. Motion to Sever

Defendants move for separate trials of the plaintiff's claims on the ground that those claims were misjoined under Federal Rule of Civil Procedure 20. The Rule states in pertinent part:

> (a) **Permissive Joinder.** All persons may join in one action as plaintiffs if they assert any right to relief jointly, severally, or in the alternative in respect of or arising out of the same transaction, occurrence, or series of transactions or occurrences and if any question of law or fact common to all these persons will arise in the action.

The key focus is whether the various claims are part of a "series of transactions or occurrences."

 The liberal rule for joinder of parties is designed "to promote trial convenience and expedite the final determination of disputes, thereby preventing multiple lawsuits. Single cases generally tend to lessen the delay, expense and inconvenience to all concerned." *Mosley v. General Motors Corp.*, 497 F.2d 1330, 1332 (8th Cir.1974). The question of severance is committed to the discretion of the Court, and under Rule 20(b) the claims may be

---

of the existence of the Customer's Agreement unnecessary.

**8.** In light of the Court's disposition of the motion to compel arbitration of Hall's claims, the present analysis does not apply to her, pending the outcome of the determination on the existence of an agreement to arbitrate under the Customer's Agreement. *See supra* note 5.

separated for trial to prevent delay or prejudice. *Hohlbein v. Heritage Mutual Ins. Co.*, 106 F.R.D. 73, 78 (E.D.Wis.1985).

The first requirement for joinder of parties is to test whether the claims arise from a series of transactions. Courts have applied the rule 13(a) "logical relationship" standard: "[A]ll 'logically stated' events entitling a person to institute a legal action against another generally are regarded as comprising a transaction or occurrence." *Mosley*, 497 F.2d at 1333 (quoting 7 C. Wright, A. Miller & M. Kane, *Federal Practice and Procedure* § 1653). The rule endows the Court with considerable flexibility to consider the parameters of each claim to determine whether the goal of judicial economy can be reconciled with the need to protect defendants from prejudice.

■■■ If the claims are part of a series, then the Court must decide whether the claims share a common question of law or fact before permitting a single trial. As this Court has noted, the Rule "does not require precise congruence of all factual and legal issues...." *Mesa Computer Utilities, Inc. v. Western Union Computer Utilities*, 67 F.R.D. 634, 637 (D.Del. 1975). By its terms, Rule 20(a) only requires a single basis of commonality, in either law or fact, for the joinder to be acceptable. *See Mosley*, 497 F.2d at 1334 (Rule does not establish "qualitative or quantitative test for commonality"). That does not, however, answer the question of whether the joinder will cause undue delay or prejudice. In order to determine whether a particular joinder of parties meets the Rule 20 requirements, the substantive law of the claims must be referenced to discover the necessary unifying elements.

Each plaintiff asserts Mieczkowski entered into a series of unauthorized and excessive transactions on their accounts and mislead them about the value of their respective investments, all in violation of Rule 10b–5. Each plaintiff also sues Prudential-Bache, Camp and Kane for failing to adequately supervise Mieczkowski, as controlling persons under Securities Exchange Act § 20(a).[9] Plaintiffs also assert Prudential-Bache is vicariously liable for the illegal acts of its employees.[10] Finally, state law claims are asserted against the defendants.[11]

Each cause of action is dependent on proving Mieczkowski committed fraudulent acts. The plaintiffs' theory under federal securities law, however, is not clear. They may argue unauthorized trading is in and of itself a 10b–5 violation. In one case this theory permitted injured parties to recover, but there was also proof of extensive misrepresentations regarding the transactions that make the case a more traditional 10b–5 action. *See Nye v. Blyth, Eastman, Dillon & Co.*, 588 F.2d 1189 (8th Cir.1978). Plaintiffs have not alleged Mieczkowski misled them in order to make the unauthorized transactions, although that may be implicit in their complaint. Moreover, a necessary element of their case will be proof of *scienter* because unauthorized trading alone is not a 10b–5 violation. *Brophy v. Redivo*, 725 F.2d 1218, 1220 (9th Cir.1984).

In the complaint, plaintiffs allege at various points Mieczkowski "entered into a pattern of excessively buying and selling securities ... in disproportionate relation to the size and nature of the account" in order to generate commission. Dkt. 46. The claim essentially states a "churning" violation, and the parties have labelled the cause of action as such. Traditional churning cases, however, involve discretionary accounts while these plaintiffs' accounts were non-discretionary.

■■■ "Churning" takes place when a broker engages in excessive trading to gen-

---

9. Wullfaert does not have a § 20(a) cause of action against Camp because he had left the Wilmington office prior to Wullfaert's opening her account. *See supra* p. 271.

10. Four plaintiffs also claim Prudential-Bache failed to warn them when Mieczkowski solicited their account for a new firm in August, 1985.

11. The state law claims of the Doughertys and Snyder will be arbitrated, according to the provisions of their Customer Agreements.

erate commissions without regard for the client's investment objectives. *See Costello v. Oppenheimer & Co., Inc.*, 711 F.2d 1361, 1367 (7th Cir.1983); *Thompson v. Smith Barney, Harris Upham & Co.*, 709 F.2d 1413, 1416 (11th Cir.1983); *In Re Catanella and E.F. Hutton & Co.*, 583 F.Supp. 1388, 1405 (E.D.Pa.1984). Churning is undisputably recognized as a violation of § 10(b) and Rule 10b–5, *id., see Hecht v. Harris, Upham & Co.*, 430 F.2d 1202, 1206–1207 (9th Cir.1970), and proof of a violation requires evidence that 1) the broker exercised control over the transactions in the account and 2) the amount of trading was excessive. *Costello*, 711 F.2d at 1368. *See In Re Catanella*, 583 F.Supp. at 1407 (requiring proof beyond these elements would be redundant and contravene statutory purpose). In addition, plaintiff must meet the general scienter requirement for proof of a § 10 and Rule 10b–5 violation.

██ The key to proving a churning claim where the account is non-discretionary is demonstrating Mieczkowski exercised power over the account despite the plaintiffs' reservation of authority to approve all transactions. The broker's degree of control must be of such magnitude to establish the account became in effect discretionary. Among the factors a Court looks to in determining the level of control over a non-discretionary account are: the degree of discretion the broker exercised; the sophistication of the investor, considering age, education and financial expertise; the broker-client relationship, especially whether the client placed heavy reliance on the broker's recommendations. *Tiernan v. Blyth, Eastman, Dillon & Co.*, 719 F.2d 1, 3 (1st Cir.1983); *Follansbee v. Davis, Skaggs & Co.*, 681 F.2d 673, 677 (9th Cir. 1982); *Nunes v. Merrill Lynch, Pierce, Fenner & Smith*, 635 F.Supp. 1391, 1394–95 (D.Md.1986). If there is evidence that a number of transactions were executed without prior customer approval "the courts will often interpret this as a serious usurpation of control by the broker." *Leib v. Merrill Lynch, Pierce, Fenner & Smith*, 461 F.Supp. 951, 954 (E.D.Mich.1978). *See M & B Contracting Corp. v. Dale*, 601

F.Supp. 1106, 1111–12 (E.D.Mich.1984). Assuming an injured client proves the necessary degree of control, excessiveness and scienter must still be established. *See Costello*, 711 F.2d at 1368 ("essential issue of fact is whether the volume of transactions, considered in the light of the nature and objectives of the account, was so excessive as to indicate a purpose on the part of the broker to derive a profit for himself at the expense of the customer.").

██ The claims against Camp, Kane and Prudential-Bache under § 20(a) of the Securities Exchange Act, 15 U.S.C. § 78t(a), require a finding of "control" over the acts of Mieczkowski for the imposition of joint and several liability. The defendants can assert a good faith defense under the statute that they "did not directly or indirectly induce the act or acts constituting the violation or cause of action." This defense will depend on whether the defendants can prove they did not culpably participate in a violation. *Rochez Brothers, Inc. v. Rhoades*, 527 F.2d 880, 891 (3d Cir.1975). The key question will be the degree of knowledge that the defendants had, and what steps, if any, they took to prevent any fraudulent acts. Prudential-Bache's vicarious liability under the doctrine of *respondeat superior* is separate from § 20(a) liability. In the context of broker-dealers, a stringent duty to supervise employees is imposed, and a broker's employer is liable for violations under traditional agency principles. *Sharp v. Coopers & Lybrand*, 649 F.2d 175, 181–82 (3d Cir.1981); *Rochez Brothers, Inc.*, 527 F.2d at 886. *See In Re Atlantic Financial Management, Inc.*, 784 F.2d 29, 30–31 (1st Cir.1986) (analyzing *respondeat superior* rule in circuits).

The Court's review of the relevant legal principles makes clear the plaintiffs' have raised a common question of law. Each alleges a 10b–5 violation, including allegations Mieczkowski misled them regarding their accounts, regularly overstating the value of the investments. In addition, plaintiffs assert related state law violations. Specific proof of a violation, however, will require plaintiffs to detail Mieczkowski's particular dealings with each of

them. For example, the issue of excessiveness will necessarily vary with each plaintiff, based on their individual investment and type of account. The unifying aspect among these plaintiffs, their churning, unauthorized transactions, and misrepresentation claims, also shows there is not a great degree of commonality among the various transactions involving Mieczkowski and Prudential-Bache because each claim rests on different statements and investment positions. It is not clear whether the claims arise out of a series of transactions.

The courts have reached conflicting results where there is a joinder of parties when their claims arise out of similar but not identical transactions. *Compare Papagiannis v. Pontikis*, 108 F.R.D. 177 (N.D. Ill.1985) (complaint fails to show any linkage between transactions between separate plaintiffs and defendants); *Kenvin v. Newburger, Loeb & Co.*, 37 F.R.D. 473 (S.D.N.Y.1965) (plaintiff's allegations against defendants distinct and unrelated except all allege breach of same statutory duty), *with Nor-Tex Agencies, Inc. v. Jones*, 482 F.2d 1093 (5th Cir.1973) (joinder of third-party plaintiffs' claims permitted where transaction part of broader scheme by defendant); *Hohlbein v. Heritage Mutual Ins. Co.*, 106 F.R.D. 73 (E.D.Wisc.1985) (although material dissimilarities among plaintiffs' claims, joinder permitted pending further pretrial proceedings); *Russo v. Bache, Halsey, Stuart & Shields, Inc.*, 554 F.Supp. 613 (N.D.Ill.1982) (permitting joinder of claims despite difference between plaintiffs' financial positions, losses, and investment sophistication). The obvious problem a court faces is determining the degree of transactional similarity necessary to overcome problems of jury confusion, hearsay, and prejudice.

 The present litigation is still in discovery, and the record is not yet sufficient to ascertain the relationship between the facts and the 10b–5 theories plaintiffs may rely on. More importantly, preliminary issues which will affect the number of plaintiffs and claims have not been resolved. The validity of the settlement agreement and release between the Gallaghers and

Prudential-Bache will determine whether they can press a 10b–5 claim. The Doughertys and Snyder will have their state law claims arbitrated, and pending the outcome of *McMahon v. Shearson/American Express, Inc.*, that remedy may cover 10b–5 claims. Finally, the Court must determine under 9 U.S.C. § 4 whether an agreement to arbitrate under the Customer's Agreements existed between Hall, the Doughertys and Prudential-Bache. If the Court were to hold that these plaintiffs validly consented to arbitrate any disputes, then those claims must also be sent to arbitration.

At this stage of the proceedings, the Court cannot fairly determine whether the plaintiffs' claims arise from a series of transactions for joinder under Rule 20. Moreover, upon completion of pretrial proceedings, the number of plaintiffs and claims could be significantly diminished, lessening any need for severing the trials.

Once the record is complete, the 10b–5 theories may not apply uniformly to each plaintiff, permitting severance of some claims. State law issues related to the federal claims may similarly permit the Court to sever without necessarily conducting separate trials for every plaintiff. The Court will deny defendants' motion to sever without prejudice to renew the motion after completion of discovery and all other pretrial proceedings. In order to facilitate the orderly processing of the litigation, the Court will set for trial the proceedings involving the validity of the Doughertys' and Hall's Customer Agreements and the enforceability of the waiver signed by the Gallaghers. Those trials can commence after the completion of discovery and consideration of any case dispositive motions.

### CONCLUSION

The Court will hold in abeyance defendants' motion to compel arbitration of the Doughertys' and Hall's claims related to transactions governed by the Customer's Agreements and will order further proceedings on the issue of the existence of an agreement to arbitrate under the Customer's Agreements in conformity with 9

U.S.C. § 4. The motion to compel arbitration of all the Doughertys' state law claims related to transactions governed by the Joint Account Agreement will be granted. The Court will hold in abeyance defendants' motion to compel arbitration of the Doughertys' and Snyder's federal law claims, pending the Supreme Court's decision in *McMahon v. Shearson/American Express*. Defendants' motion to sever the claims will be denied without prejudice to their right to renew the motion after the completion of discovery and all pretrial proceedings. Finally, the Court will schedule a pretrial conference to set trial on the existence of the Customer's Agreements, the validity of the Gallagher's release, and to consider any other outstanding motions preliminary to trial.